IN THE CIRCUIT COURT OF THE
FIRST JUDICIAL CIRCUIT, IN AND
FOR ESCAMBIA COUNTY, FLORIDA

**LATONIA ADAMS,**

     Plaintiff,

v.

**ESCAMBIA COUNTY, FLORIDA,**

     Defendant.

_____/

CASE NO.: 25-CA-
FLA BAR NO.: 0739685

## COMPLAINT

Plaintiff, LATONIA ADAMS, hereby sues Defendant, ESCAMBIA COUNTY, FLORIDA and alleges:

### NATURE OF THE ACTION

1.    This is an action brought under Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000e et seq., the Americans with Disabilities Act (ADA), codified at 42 U.S.C. § 12101, et seq., §440.205, Florida Statutes, and 42 U.S.C. §1981a.

2.    This action involves claims which are, individually, in excess of Fifty Thousand Dollars ($50,000.00), exclusive of costs and interest.

### THE PARTIES

3.    At all times pertinent hereto, Plaintiff, LATONIA ADAMS, has been a resident of the State of Florida and was employed by Defendant. Plaintiff is a member of a protected class due to her race, actual and/or perceived disability, Defendant's failure to provide a reasonable accommodation, and because she reported an on-the-job injury and sought benefits under Chapter 440, Florida Statutes. Plaintiff was retaliated against after reporting Defendant's unlawful employment practices.

4.     At all times pertinent hereto, Defendant, ESCAMBIA COUNTY, FLORIDA has been organized and existing under the laws of the State of Florida. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer as it relates to these claims.

## CONDITIONS PRECEDENT

5.     Plaintiff has satisfied all conditions precedent to bringing this action.

## STATEMENT OF THE ULTIMATE FACTS

6.     Plaintiff, an African American female who attempted to receive or obtain Workers' Compensation benefits under Chapter 440, Florida Statutes, began her employment with Defendant's Correctional facility on or about December 15, 2003, and held the position of Correctional Officer (CO) until her wrongful termination on December 2, 2024.

7.     Plaintiff was a loyal and dedicated employee.

8.     During her employment with Defendant, Plaintiff was subjected to disparate treatment, different terms and conditions of employment, and was held to a different standard because of her race, actual and/or perceived disability, and Defendant failed to provide a reasonable accommodation, and because she reported an on the job injury and sought benefits under Chapter 440, Florida Statutes. Plaintiff was subject to retaliation thereafter and after she reported discriminatory practices adversely affecting her.

9.     The disparate treatment and retaliation came at the hands of specifically but not limited to Lieutenant Sky Madison, Lieutenant Ronald Andrews, WC Specialist Escambia County BCC Risk Management Carrie Seals, and Defendant's Human Resources (HR) Department.

10. In or around February 15, 2018, Plaintiff was involved in a car accident and sustained a neck injury, of which Defendant was aware.

11. On or around March 22, 2021, Plaintiff sustained a back injury at work, which she reported to Defendant shortly after it occurred. The injury occurred while Plaintiff was escorting a mentally ill female inmate back from court when the inmate bit Plaintiff and resisted restraint. During the altercation, the inmate threw her mattress on the ground, causing Plaintiff to trip and injure her back. Plaintiff was escorted to Urgent Care and was seen by Dr. Robert Lurate and subsequently filed a claim under workers compensation with Seals and Lost Time Claims Adjuster Karen Todd. Plaintiff was then placed on light-duty for her back injury as requested by physician, Dr. Lurate.

12. On March 31, 2021, Plaintiff was placed on light-duty by Seals for her back injury.

13. On April 23, 2021, Plaintiff was reinstated to full duty.

14. In or around mid-2021, Plaintiff was working her morning court shift. At that time, Defendant hired Lieutenant Ashley Hicks, to work in Transportation. While Plaintiff was out on medical leave for neck surgery, her position was reassigned to Hicks. Although Plaintiff had more seniority and relevant experience, the position was given to Hicks after she expressed interest in it. Hicks also maintained a close personal relationship with Madison. Plaintiff was later informed by Sergeant Johnathan Stuckey, that she had been moved to the Medical unit, a physically demanding assignment that involved transporting pregnant inmates and moving wheelchairs, despite her ongoing medical restrictions.

15. In or around December 2021, Plaintiff had a death in the family and was approved for three bereavement days.

16. On the second day, Plaintiff was contacted and requested to come to work by Madison, so Plaintiff's Caucasian co-worker, CO Tammy Gourley, could go home. Plaintiff was made to come in to relieve Gourley despite being on approved bereavement leave. Plaintiff was upset and went to talk to Lieutenant Haley Reid, Caucasian, regarding the situation. Plaintiff was then asked by Reid if she wanted to go home, to which she responded, "Yes," and was told she could leave.

17. On or around June 27, 2024, Plaintiff injured her right elbow on the job while repeatedly picking up wheelchairs which also aggravated her previous back injury. Plaintiff was sent to Urgent Care and seen by Dr. Bradley Hawkins, who stated that she had "tennis elbow" from constantly picking up a wheelchair while at work.

18. Plaintiff subsequently filed a workers compensation claim on July 1, 2024 with Seals and requested light duty per Dr. Hawkins for her elbow. Despite medical documentation and her request for an accommodation, Seals denied Plaintiff's light-duty request, failing to accommodate her.

19. In addition to being denied accommodations that her white coworkers were given, Plaintiff was treated less favorably than Caucasian coworkers including but not limited to CO Christopher Johnson, regarding receiving credit for taking courses that qualified him for a raise. Plaintiff was required to complete certain computer-based training courses in order to qualify for a raise. She completed these courses on her work computer during her designated break periods. She was later informed by Chief William Powell, Caucasian, that she would not receive credit for the courses because they were allegedly completed during work hours, which Plaintiff denied. In contrast, Johnson completed the same courses in a similar manner and received full credit without issue.

20. Additionally, Plaintiff was also treated less favorably than her Caucasian coworkers, including but not limited to CO Annie Quiggins, regarding disability accommodations. Quiggins, who suffered from kidney stones, which was a non-work-related condition, was allowed to remain seated in the office and was not required to perform physically demanding duties. These accommodations were not similarly extended to Plaintiff, despite her qualifying disability and comparable or more severe circumstances.

21. Plaintiff was also required to perform physically demanding tasks in her "Medical" assignment, including providing inmate medical care and repeatedly retrieving and carrying wheelchairs throughout the day, despite her prior back injury, neck surgery and subsequent injury. Plaintiff was informed by Stuckey that she would stay in Medical so that Kissoon and Gourley could remain in the Transportation unit.

22. Plaintiff raised concerns about these reassignments and the lack of accommodation through multiple complaints to Defendant's HR, Captain Shawn Hankins, Caucasian, and Commander Gregory "Scott" Nash, Caucasian. Her complaints were consistently dismissed without investigation or corrective action. When Plaintiff requested a direct meeting with Powell to address her concerns, the request was denied. Meanwhile, similarly situated Caucasian employees with medical conditions remained in light-duty roles or office assignments, while Plaintiff was assigned more strenuous work despite having documented medical restrictions. Although Plaintiff continued to express willingness to work within her limitations, her efforts to obtain less physically demanding assignments were repeatedly denied or overlooked.

23. When Gourley retired in or around March 2024, Plaintiff requested to be moved to her position, as it primarily involved paperwork and would have accommodated her work-

related injury through light duty. Around the same time, Defendant moved CO Kim Cox to Transportation, who is also African American. Rather than assigning Cox to the desk position, Defendant sent her to work at the courthouse. Just a few days later, Quiggins arrived in the Transportation unit and was placed in the paperwork position previously held by Gourley, even though Plaintiff was more qualified and needed a light-duty position to accommodate her. Quiggins was also given a permanent desk before Cox. Plaintiff contends that this decision reflects discriminatory treatment based on race, as two African American officers were overlooked in favor of a less qualified white employee.

24. According to Defendant's policy, only female officers are permitted to escort female inmates out of the jail. However, Plaintiff was routinely assigned to escort both male and female inmates, in violation of this policy. On one occasion, Supervisor Lieutenant Barry Owens, Caucasian, contacted Plaintiff's direct supervisor, Madison, and informed him that he could not assign a female officer to escort male inmates because it was against policy. Despite this, Madison had been assigning such duties to Plaintiff for several years without regard to the policy.

25. On July 1, 2024, Plaintiff was placed on light duty for her elbow injury.

26. On or around August 5, 2024, Plaintiff was sent home early by Seals due to her work-related elbow injury without an explanation. However, Plaintiff was reinstated for light duty based on her prior back injury, which occurred on March 22, 2021. Plaintiff subsequently sent an email to Defendant's HR regarding filing a complaint with Spainhower via email about her being sent home early by Seals. Plaintiff did not receive a response.

27. Later that day, Plaintiff went to Defendant's HR office and spoke with Seals and HR Specialist Employment Relation Division Edward Spainhower, Caucasian. Plaintiff asked

why she had been sent home. Seals responded that her light-duty assignment related to her elbow injury had been denied. Plaintiff questioned why her light-duty request for her elbow was denied when her light-duty paperwork for her back injury, containing the same restrictions, had previously been approved. Seals stated that she would look into the matter.

28. Lieutenant Ronald Andrews, Caucasian, subsequently emailed Plaintiff stating that there was not much work left for the day and that she could return to work the following day, August 6, 2024.

29. Also, on or around August 5, 2024, Plaintiff was written up for allegedly posting a false statement about Andrews on Facebook, which Plaintiff denies. The post in question was vague and referenced being treated unfairly at work, without naming any individuals. The post was screenshotted and forwarded via email from Madison to Spainhower. The write-up occurred the same day Plaintiff raised concerns about discrimination and the difficulties she was having being accommodated.

30. During this time, Plaintiff was assigned to a position referred to as "Shift," located on the opposite side of the jail and required 10-hour shifts. This assignment significantly worsened her back injury, as it required her to walk a long distance from the parking area to her post and back each day. Additionally, the role involved climbing stairs and performing tasks that fell outside the scope of her documented medical restrictions. This reassignment did not constitute a reasonable accommodation for her light-duty status and further aggravated her existing work-related back injury.

31. On or around August 6, 2024, Plaintiff sent an email regarding her workers compensation status to Todd, Seals, and Nash. Todd subsequently responded to Plaintiff's email

7

and said she had just reached out for additional information on her workers compensation status. Plaintiff did not hear back regarding this.

32. Plaintiff subsequently filed out a grievance regarding her workers compensation status on August 7, 2025, and gave it to Reid in person. Reid gave it back to Plaintiff.

33. Plaintiff forwarded the grievance up the chain of command, and her grievance was given to Hankins, via paper copy. Hankins gave the grievance to Nash after he responded to it verbally, which was not proper protocol. Per Defendant's policy, Plaintiff's grievance should have been given back to her to respond to what Hankins said and put into her file.

34. During this time, Nash sent a letter addressed to Plaintiff denying her grievance, which was given to Andrews. However, Plaintiff did not receive the letter from Andrews until August 13, 2024, due to Andrews keeping the letter in a bag in his office.

35. On August 9, 2024, Plaintiff sent an email to Defendants' HR regarding the status of her grievance she filed on August 7, 2025.

36. On August 13, 2024, when Plaintiff went to the jail to complete the FMLA paperwork related to her light-duty status because of her back injury and requested her certificate from a Crisis Response and Management class she had completed on July 29, 2024, Andrews handed her the bag containing the letter. The letter stated that Nash was placing Plaintiff's grievance on her record. Plaintiff was thereby denied the opportunity to respond to Hankins and to have her grievance properly processed in accordance with Defendant's policy. Plaintiff did not at that time get her certificate for the Crisis Response and Management class that she took.

37. That same day, Plaintiff emailed Andrews and requested the FMLA paperwork she previously requested but Andrews refused to respond.

8

38. On or about August 14, 2024, Plaintiff filed an inquiry with both the Florida Commission on Human Relations (FCHR) and the Equal Employment Opportunity Commission (EEOC) regarding her mistreatment and discrimination due to her race. Despite her complaint, Plaintiff's treatment only worsened.

39. In retaliation for Plaintiff's complaint to the Florida Commission on Human Relations (FCHR), Plaintiff was informed that Sergeant Charles VanBuren, Caucasian, stated that Defendant "needed to get rid of" Plaintiff. Despite the seriousness of this statement, no investigation was conducted into VanBuren's conduct, and Andrews, who was aware of VanBuren's comments, never addressed the comment or instructed VanBuren to stop. Additionally, VanBuren repeatedly referred to Plaintiff as a "snitch" in the workplace, in reference to her protected activity of filing reports and complaints.

40. Approximately one week later, Plaintiff spoke with Andrews in person and requested the FMLA paperwork and to be assigned to prepare court paperwork. Andrews responded, "I did not come to Transportation to move people around," indicating his reluctance to make staffing or paperwork changes since he had just become Plaintiff's supervisor.

41. On August 30, 2024, Plaintiff exhausted her light-duty entitlement.

42. When Plaintiff returned to work on September 3, 2024, she was sent home because her light-duty status had ended, and she was told to take leave under FMLA.

43. Plaintiff then received a letter from Spainhower, stating that her light-duty assignment would be limited to 12 weeks, after which she would be required to transition to leave under FMLA. If Plaintiff's light duty began on August 1, 2024, the 12-week period would not end until October 24, 2024. Defendant's assertion that her light duty would end on August 30, 2024, was therefore incorrect. Plaintiff contends that this miscalculation was a deliberate

attempt by Defendant to force her to exhaust her available leave prior to her scheduled surgery for her back injury, thereby ensuring she would have no remaining leave time during her recovery.

44. On December 2, 2024, Plaintiff was wrongfully terminated due to her exhausting FMLA leave and not being able to return to work at that time. She had requested time off as an accommodation for her disabling back condition and was fired rather than allow her additional time off.

45. Since Plaintiff's termination, Defendant has replaced her with a non-disabled Hispanic employee, Ashley San Diego.

46. Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services. Defendant should be made to pay said fee under the laws referenced above.

## COUNT I
## RACE DISCRIMINATION

47. Paragraphs 1 through 46 are re-alleged and incorporated herein by reference.

48. This is an action against Defendant for discrimination based upon race brought under 42 U.S.C. §2000e et seq. and 42 U.S.C. §1981.

49. Plaintiff has been the victim of discrimination on the basis of her race in that she was treated differently than similarly situated white employees of Defendant and has been subject to hostility and poor treatment on the basis, at least in part, of her race.

50. Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

51. Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

52. Defendant's known allowance and ratification of these actions and inactions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

53. In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a race-based nature and in violation of the laws set forth herein.

54. The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.

55. The events set forth herein led, at least in part, to Plaintiff's termination.

56. Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon race in violation of 42 U.S.C. §2000e et seq..

57. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are permanent and continuing. Plaintiff is entitled to injunctive relief.

## COUNT II
## DISABILITY DISCRIMINATION

58. Paragraphs 1 through 46 above are re-alleged and incorporated herein.

59. This count sets forth a claim for discrimination on the basis of Plaintiff's actual or perceived mental or physical disability and/ or record of impairment, brought under 42 U.S.C. §12101, et seq.

60. Plaintiff has been a victim of discrimination on the basis of actual or perceived disability and/or record of impairment. During the course of Plaintiff's employment by Defendant, Plaintiff was treated differently than similarly situated employees who are non-disabled, not perceived as disabled, or do not have a comparable record of impairment to Plaintiff.

61. Defendant is liable for the differential treatment and its refusal to accommodate Plaintiff, and engage in the interactive process with her which adversely affected a term, condition, or privilege of Plaintiff's employment with Defendant as those terms are used in the applicable statutes.

62. Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

63. In essence, the actions of agents of Defendant, which were each condoned and/or ratified by Defendant, were disability/perceived disability-based and in violation of the laws set forth herein.

64. The discrimination complained of herein affected terms, conditions, and privileges of Plaintiff's continued employment by Defendant. The events set forth herein led, at least in part, to Plaintiff's termination.

65. Defendant's acts and omissions constituted intentional discrimination and unlawful employment practices based upon disability or perceived disability, under the laws cited herein.

66. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are occurring at present, and likely will continue in to the future. Plaintiff is entitled to equitable/injunctive relief.

## COUNT III
## WORKERS' COMPENSATION RETALIATION

67. Paragraphs 1 through 46 are re-alleged and incorporated herein by reference.

68. This is an action against Defendant for retaliation under §440.205, Florida Statutes. At all times pertinent hereto, Defendant has been subject to Chapter 440, Florida Statutes.

69. Plaintiff was employed with Defendant when she was injured on the job. She sought compensation and/or benefits including without limitation medical care under Chapter 440, Florida Statutes and was retaliated against for making or attempting to make such a claim.

70. Defendant retaliated against Plaintiff because she was injured on the job and had a valid claim for compensation and benefits under Chapter 440.

71. Defendant's actions set forth above violate §440.205, Florida Statutes, which prohibits an employer, such as Defendant, from coercing, retaliating against or otherwise adversely affecting an employee who attempts to or does claim entitlement to workers' compensation benefits under the laws of the State of Florida.

72. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These

damages have occurred in the past, are occurring at present, and likely will continue in to the future. Plaintiff is entitled to equitable/injunctive relief.

## COUNT IV
## RETALIATION

73. Paragraphs 1 through 46 are re-alleged incorporated herein by reference.

74. This is an action against Defendant for unlawful retaliation after Plaintiff reported unlawful employment practices adversely affecting her under 42 U.S.C. § 2000e et seq. and 42 U.S.C. §12101 et seq.

75. Defendant is an employer as that term is used under the applicable statutes referenced above.

76. The foregoing unlawful actions by Defendant were purposeful.

77. Plaintiff voiced opposition to unlawful employment practices during her employment with Defendant and has been the victim of retaliation thereafter.

78. The events set forth herein have led, at least in part, to adverse actions against Plaintiff.

79. Plaintiff is a member of a protected class because she reported unlawful employment practices and has been the victim of retaliation thereafter. There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

80. As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, lost opportunities, loss of capacity for the enjoyment of life, and other tangible and intangible damages. These damages are continuing and are permanent. Plaintiff is entitled to injunctive/equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a) that process issue and this Court take jurisdiction over this case;

(b) that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c) enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d) enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e) enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f) award Plaintiff interest where appropriate; and

(g) grant such other further relief as being just and proper under the circumstances, including but not limited to reinstatement.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

DATED this 1st day of August 2025.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
Facsimile: (850) 383-4801
Marie@mattoxlaw.com
Secondary emails:
marlene@mattoxlaw.com
michelle@mattoxlaw.com

ATTORNEYS FOR PLAINTIFF